## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **DECATUR LIQUORS, INC.,** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 04-1971 (RMC)** |
| | ) | |
| **DISTRICT OF COLUMBIA,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

Can the Council of the District of Columbia adopt a substantive change to a legislative bill at its Final Reading and pass the bill as amended without public notice and an opportunity for public discussion? Finding that this procedure violated a mandatory provision of the Home Rule Act, the Court will declare the Targeted Ward 4 Moratorium Zone, as provided in Title 1, Section 101(o) of the Omnibus Alcoholic Beverage Amendment Act of 2004 ("Omnibus Act" or "Act"), null and void.

## PROCEDURAL SUMMARY

Plaintiffs are holders of Class A and Class B liquor licenses in Ward 4 of the District of Columbia. On November 12, 2004, they filed a complaint and moved for a temporary restraining order ("TRO") to prohibit the District of Columbia and the Alcoholic Beverage Regulation Administration ("Defendants") from enforcing the Targeted Ward 4 Moratorium Zone and its related provisions, as provided in Title I, Section 101(o) of the Omnibus Act, D.C. LAW 15-187 (to be codified at D.C. CODE § 25-3419(a)-(d)). These provisions would, *inter alia*, place a moratorium

on the sale of single containers of beer, malt liquor, and ale in parts of Ward 4 in Washington, D.C.

Plaintiffs allege that the Omnibus Act: 1) was not duly enacted and is null and void; 2) denies due

process to current license holders; 3) denies equal protection to license holders; and 4) is void for

vagueness.  After a hearing held on November 12, 2004, the Court issued a Temporary Restraining

Order that was later extended by agreement of the parties.

       In anticipation of oral argument on the motion for a preliminary injunction,

Defendants filed a motion to dismiss or for summary judgment, which was fully briefed.   On

December 21, 2004, the Court heard oral argument, ruled on the record in open court, and issued a

preliminary injunction.  The Court found that "Plaintiffs have made a substantial showing of their

likelihood of success on the merits of their claim that their class A and class B liquor licenses qualify

as 'property' – thereby implicating the protections of procedural due process under the Fifth

Amendment to the United States Constitution – and that their rights to procedural due process have

been violated."  *See* Dkt. No. 15 (December 21, 2004 Preliminary Injunction) at 2.[1]

       At the suggestion of the parties, the Court approved limited discovery and set a

schedule for briefing and argument on dispositive motions.  On April 29, 2005, Defendants filed a

Motion to Dismiss or, in the Alternative, for Summary Judgment ("Defs.' Mot.") and Plaintiffs filed

a Motion for Partial Summary Judgment ("Pls.' Mot.").  The Court received oppositions and replies

and the parties filed a stipulation regarding the legislative history of the Omnibus Act.

       The wisdom of the legislation is not at issue and is solely a matter for elected

---

[1]  On January 7, 2005, Defendants filed a motion to dissolve the preliminary injunction, which the Court denied because Defendants had appealed and the Court was without jurisdiction. *See Decatur Liquors v. District of Columbia*, 2005 U.S. Dist. LEXIS 4246 (D.D.C. Mar. 16, 2005).

representatives.  The questions are entirely legal: was the Omnibus Act properly enacted; does the Targeted Ward 4 Moratorium violate Plaintiffs' constitutional rights; and is the moratorium otherwise constitutionally invalid?  After oral argument on June 3, 2005 and after consideration of the now-voluminous briefs and legislative record, the Court finds that the D.C. Council did not observe the requirements of the D.C. Home Rule Act, D.C. CODE § 1-201.01 *et seq*., when it passed the Omnibus Act because the inclusion of the moratorium on the sale of alcoholic beverages in Ward 4 was a substantial change in the legislation that required a "second reading" prior to passage.  Because mandatory legislative process was not observed, the portions of the Omnibus Act that pertain to this moratorium are null and void and summary judgment will be granted for Plaintiffs on this count.  Because the Court's injunction stalled enforcement of the law and because the Court has found the relevant portions of the Omnibus Act null and void, Plaintiffs have not and will not incur a cognizable injury and the remaining constitutional claims will be denied as moot.

## HOME RULE ACT

Through the Home Rule Act, Congress "delegate[d] certain legislative powers to the government of the District of Columbia . . . and, to the greatest extent possible, consistent with the constitutional mandate, relieve[d] Congress of the burden of legislating upon essentially local District matters."  D.C. CODE § 1-201.02(a).  To achieve these purposes, Congress established the Council of the District of Columbia, D.C. CODE § 1-204-01, and vested it with "legislative power" subject to certain procedural limitations.  D.C. CODE § 1-204-04(a).  Chief among these limitations is a requirement that acts be read twice in substantially the same form prior to adoption.

> The Council, to discharge the powers and duties imposed herein, shall pass acts and adopt resolutions, upon a vote of a majority of the members of the Council present and voting, unless otherwise

provided in this chapter or by the Council.  Except as provided in the last sentence of this subsection, the Council shall use acts for all legislative purposes.  *Each proposed act* (other than an act to which § 1-204.46 applies) *shall be read twice in substantially the same form, with at least 13 days intervening between each reading.* Upon final adoption by the Council each act shall be made immediately available to the public in a manner which the Council shall determine.

D.C. CODE § 1-204.12(a) (emphasis added).

## LEGISLATIVE RECORD

The Omnibus Act went into effect on September 30, 2004, nearly a year after it was first proposed.[2]  Title I, Section 101(o) of the Act establishes a four-year moratorium on the sale of single containers of beer, malt liquor, and ale in an area designated as the Targeted Ward 4 Moratorium Zone ("Targeted Zone").  *See* Stipulated Designation of Legislative Materials ("Stipulated Materials"), Ex. 17 (Enrolled Original, Bill 15-516 (May 18, 2004)) at 4-5.  Within the Targeted Zone, "a licensee under an off-premises retailer's license, class A or B, shall not divide a manufacturer's package of more than one container of beer, malt liquor or ale, to sell an individual container of the package . . . [nor] sell, give, offer, expose for sale, or deliver an individual container of beer, malt liquor, or ale with a capacity of 70 ounces or less."  D.C. LAW 15-187.[3]  The Targeted Zone is defined in forty-two single-spaced lines as "the area bounded by the line starting [and

---

[2]  Unless otherwise noted, the facts upon which the Court relies are taken from the stipulated legislative record of the Omnibus Act and from the undisputed facts as represented by the parties.  *Compare* Plaintiffs' Statement of Material Facts *and* Defendants' Opposition to Plaintiffs' Statement of Material Facts.

[3]  Holders of class A off-premises retailer's licenses may sell spirits, beer, and wine. Holders of class B off-premises retailer's licenses may sell beer and wine.  *See* D.C. CODE § 25-112(d)(1) & (2).  Plaintiff Decatur Liquors, Inc. holds a class A license for a store within the Targeted Zone of Ward 4.  Plaintiff Chekole Teshome (*t/a* Town and Country Market) holds a class B license for a store within the Targeted Zone.

ending] at 13th Street, N.W. and Eastern Avenue, N.W." *See* Stipulated Materials, Ex. 21 (D.C. Act

15-442 (June 23, 2004)) at 4.  If this dense text is plotted on a map, it is evident that the Targeted

Zone is finely drawn to include each and every business in Ward 4 that holds a Class A or Class B

off-premises liquor retailer's license.  *See* Plaintiffs' Opposition to Motion to Dismiss, Ex. F (Map

of Targeted Zone's coverage of license holders in Ward 4).[4]  The Moratorium also prohibits the

transfer of Class A or Class B licenses to areas within Ward 4 that are outside the Targeted Zone.

Resolution of Plaintiffs' challenge under the Home Rule Act demands that the Court

thoroughly scrutinize the sequence of legislative events.  In October of 2003, Mayor Anthony

Williams proposed the "Omnibus Alcoholic Beverage Amendment Act of 2003."  Stipulated

Materials, Ex. 1 (Mayor Anthony Williams's October 17, 2003 Letter to Linda Cropp) at 1.  The

proposed legislation, later designated Bill 15-516, addressed Alcoholic Beverage Control ("ABC")

manager training, ABC licensing of certain events, and the powers of investigators and police

officers to prosecute minors for underage drinking.  As initially conceived, Bill 15-516 did not

contain restrictions on the sale of alcoholic beverages by Class A or Class B licensees in Ward 4.

On October 21, 2003, D.C. Council ("Council") Chairperson Linda Cropp referred

Bill 15-516, along with Bills 15-510 ("Restaurant Amendment Act of 2003") and 15-513 ("Catering

Amendment Act of 2003") to the District of Columbia Committee on Consumer and Regulatory

Affairs ("CCRA"), a committee of the Council.  The CCRA published notice of intent to act on new

---

[4] Defendants argue that Plaintiffs' claim that all Ward 4 Class A and Class B license
holders are included in the Targeted Zone is misleading and inaccurate, but provide no competent
evidence to the contrary.  *See* Defendants' Opposition to Plaintiffs' Statement of Material Facts
¶ 35.  A defendant may not rely on unsupported conclusory statements to rebut a well-supported
factual claim on summary judgment.  *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999);
*Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993).

legislation and notice of public hearings.  Stipulated Materials, Exs. 2-4 (notices of public hearing

dated October 31, 2003 and November 14, 2003).  After public hearings in November 2003, at which

testimony was received, the CCRA consolidated the three bills into Bill 15-516 and the Council

placed the bill on its legislative agenda.  *See* Stipulated Materials, Ex. 5 (Committee on Consumer

and Regulatory Affairs March 9, 2004 Report).

Bill 15-516 received its "first reading" by the Council on April 20, 2004.  Stipulated

Materials, Ex. 7 (Mark-up Agenda Noting Council Actions and Assignments, Tuesday, April 6,

2004).  That same day, Councilmember Adrian Fenty proposed an amendment to the bill that would

ban the sale of single containers of certain types of alcohol in all of Ward 4 to combat "intolerable

levels of loitering, public drunkeness, public indecency, and littering on residential streets of this

section of the District."  Stipulated Materials, Ex. 8 (Amendment offered by Councilmember Fenty

(April 20, 2004)) at 2.  This proposed amendment failed on roll call and did not become a part of

Engrossed Bill 15-516.[5]   The Council voted seven to six against adopting the Ward-wide ban.

Among the most vocal critics of the proposed amendment were Councilmembers Carol Schwartz,

David Catania, and Sharon Ambrose who described the legislation variously as discriminatory,

repressive, and overbroad.

After public notice that Bill 15-516 was scheduled for its "Final Reading and Final

Vote," the bill was presented to the Council for a second reading on May 18, 2004.  Stipulated

Materials, Ex. 12 (Mark-Up Agenda Noting Council Actions and Assignments, Tuesday, May 4,

---

[5]  An "Engrossed Original" is the written text of "a bill that has passed any reading prior to the final reading."  *D.C. Council Rules*, Art. I, § 101(16).  An engrossed original was produced for the April 20, 2004 "first reading" of Bill 15-516.  *See* Stipulated Materials, Ex. 11 (Engrossed Original, Bill 15-516 (April 20, 2004)).  It did not contain any reference to Ward 4.

2004) at 46.  *See also* Plaintiffs' Statement of Material Facts ("Pls.' Facts") ¶ 17 (disputed by Defendants in part).  Prior to a vote on Bill 15-516, Councilmember Fenty again introduced an amendment that would restrict the sale of certain alcoholic beverages in Ward 4.  This amendment ("Fenty Amendment") proposed a restriction on the sale of individual containers of beer, malt liquor, and ale within a "targeted" area of Ward 4.  According to Councilmember Fenty, the new version of the moratorium was narrowly-tailored because it attacked specific trouble spots in Ward 4 – an area designated the Targeted Ward 4 Moratorium Zone.

Notably, the amendment was co-sponsored by, among others, Councilmembers Schwartz and Catania, who had argued against the proposed moratorium in April.  Although Councilmember Ambrose also appeared to believe that the Fenty Amendment was narrowly-tailored, she remained steadfast in her opposition, arguing that it constituted a substantial change to the Omnibus Act that required a third reading before adoption.  Chairperson Cropp tersely disagreed, stating that the amendment narrowed the previously-rejected Ward-wide ban and, in any event, was not a new issue before the Council that required a third reading.  *See* Stipulated Materials, Streaming Video of May 18, 2004 Council Session, *available at* http://www.dccouncil.washington.dc.us.[6]

As "tailored," the moratorium on the sale of alcohol in the Targeted Zone passed on roll call vote and the Fenty Amendment was included as a new section in Bill 15-516 – Title I, Section 101(o).  *See id*. (nine votes in favor, three votes against, and one abstention).  The bill

---

[6]  "[T]he D.C. Council's interpretation of its responsibilities under the Home Rule Act is entitled to great deference." *Tenley and Cleveland Park Emergency Comm. v. D.C. Bd. of Zoning Adjustment*, 550 A.2d 331, 334 n.10 (D.C. 1988).  This Court agrees that deference is due to the Council but does not consider Chairperson Cropp's terse statement in the to-and-fro of legislative debate among Council members to constitute the "Council's interpretation of its responsibilities."

received its "Final Reading" that same day, was adopted by the Council, *see* Stipulated Materials, Ex. 16 (Council Vote on "Final Reading" (May 18, 2004)), and transmitted to the Mayor for his review, *see* Pls.' Facts ¶ 26.  An "enrolled original" of the Act, as adopted on May 18, 2004, was produced.  *See* Stipulated Materials, Ex. 17 (Enrolled Original, Bill 15-516 (May 18, 2004)).[7]

Chairperson Cropp thereafter recalled the bill from the Mayor.  On June 1, 2004, prior to the conclusion of the Mayor's review period and without public notice, the Council reconsidered and amended portions of Bill 15-516 to extend the hours of businesses with class B licenses that qualify as "supermarket[s]" ("Supermarket Amendment").  *See* Pls.' Facts ¶¶ 27 & 28;  Stipulated Materials, Ex. 20 (Council Vote on Reconsideration (June 1, 2004)).  There appear to be only five qualifying supermarkets in the entire District of Columbia; the record is unclear as to whether any of them is in Ward 4.  One Councilmember objected to the Supermarket Amendment because it extended beyond the geographic scope of the Fenty Amendment, which the Council had just passed. This was the only reference on June 1 to the Fenty Amendment.  On June 9, 2004, the Council re-transmitted Bill 15-516, as reconsidered and amended on June 1, 2004, to the Mayor and, on June 23, 2004, the Mayor approved and signed Bill 15-516, which became D.C. Act 15-442.  Stipulated Materials, Ex. 21 (D.C. Act 15-442 (June 23, 2004)).

The Mayor then submitted the Omnibus Act to Congress for the statutorily-required period of review.  After this period expired, the Act took effect and the Alcoholic Beverage Regulation Administration ("ABRA") notified Class A and Class B licensees in Ward 4 that the Omnibus Act would be enforced commencing on November 12, 2004.  Before the Act could be

---

[7]  An "Enrolled Original" is the written text of "a measure that has passed final reading." *See D.C. Council Rules*, Art. I, § 101(17).

enforced, Plaintiffs brought suit alleging a procedural violation of the District of Columbia's Home Rule Act and various federal constitutional challenges.

## LEGAL STANDARDS

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995).  To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A "genuine issue" is one that "might affect the outcome of the suit," *id.*, and "can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party," *id.* at 250.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Id.* at 255.  A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252.  To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

"An issue of law should be no barrier to a summary judgment." *Sparks v. Catholic Univ. of Am.*, 510 F.2d 1277, 1281 (D.C. Cir. 1975). *See Santa Fe Pac. R. Co. v. United States*, 294 F.3d 1336, 1340 (Fed. Cir. 2002) ("Issues of statutory interpretation and other matters of law may

be decided on motion for summary judgment."). "When the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Wyoming Outdoor Council v. Dombeck*, 148 F. Supp. 2d 1, 7 (D.D.C. 2001) (citing *Crain v. Bd. of Police Comm'rs*, 920 F.2d 1402, 1405-06 (8th Cir.1990)). *See Washington Teachers' Union Local No. 6 v. Bd. of Educ. of the D.C.*, 109 F.3d 774 (D.C. Cir. 1997) (affirming grant of summary judgment based on analysis and interpretation of Home Rule Act provisions). "Determining whether the D.C. Council exceeded its authority under the Home Rule Act is a question of statutory interpretation which requires the Court to focus on the intent of Congress." *United States v. Alston*, 580 A.2d 587, 597 (D.C. 1990).

## ANALYSIS

Plaintiffs argue that partial summary judgment should be granted on two of their claims. "First, the Omnibus Act is null and void because it was enacted in violation of the second-reading requirement and that violation was not cured." Pls.' Mot. at 2. They assert that under the Home Rule Act, "[e]ach proposed act . . . shall be read twice in *substantially the same form*, with at least 13 days intervening between each reading," D.C. CODE § 1-204.12(a) (emphasis added), and that the legislative record demonstrates that this mandatory requirement was not observed. "Second, even if the Omnibus Act had been validly enacted," Plaintiffs contend that its enforcement would violate their "due process rights" under the Fifth Amendment to the United States Constitution. Pls.' Mot. at 2. Defendants oppose on the merits and challenge the Court's jurisdiction over the pending local law claim.

Defendants move to dismiss or, in the alternative, for summary judgment. They dispute the nature and extent of the potential injury Plaintiffs would suffer if the Omnibus Act were enforced and assert that an injunction should not issue. Defs.' Mot. at 7. They also move for

summary judgment on the merits, arguing that: 1) there is a presumption of validity that attaches on a sovereign's exercise of power under the Twenty-first Amendment to regulate liquor sales, *id*. at 14; 2) Plaintiffs were not deprived of due process through the alleged procedurally-deficient adoption of the Omnibus Act; *id*. at 15; 3) the Omnibus Act is not unconstitutionally vague, *id.* at 22; and 4) any diminution in the value of Plaintiffs' licenses is not sufficient to constitute a taking under the Constitution, *id*. at 24. Plaintiffs oppose.

A.    Jurisdictional Challenges

Plaintiffs include in their complaint a distinctly local claim, alleging that "[t]he [Omnibus] Act is null and void because Council did not follow the proper procedures under the District of Columbia Home Rule Act when enacting it." Compl. ¶ 12. Defendants offer three basic challenges to the Court's jurisdiction over Plaintiffs' Home Rule Act claim. First, they assert that Plaintiffs lack standing to bring this claim "because they have not shown that the outcome would have been different had the alleged procedural violation not occurred." Defendants' Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment ("Defs.' Opp.") at 7. Second, because the federal constitutional claims are allegedly weak and "derive wholly from [Plaintiffs'] local law claim," Defendants argue that supplemental jurisdiction is inappropriate over the local law claim. *Id*. at 4. Finally, because "plaintiffs' claim regarding what constitutes a second reading 'in substantially the same form' has *not* been directly resolved by the District of Columbia Court of Appeals," Defendants argue that the Court should abstain from ruling on the local law claim. *Id*. at 5-6 (emphasis in original). The Court finds these arguments without merit and will retain

jurisdiction over the Home Rule Act claim.[8]

       1.     *Standing*

       The Home Rule Act mandates that every bill be "read twice in substantially the same form" before it can be validly adopted. D.C. CODE § 1-204.12(a). The "second-reading requirement was adopted to give notice of a pending proposal so that 'the public and interested parties can discuss the legislation' before passage." *District of Columbia v. WHOC*, 415 A.2d 1349, 1352 (D.C. 1980) (citation omitted). To challenge an act of the Council as a violation of the Home Rule Act, a plaintiff must have "standing." *See Dimond v. District of Columbia*, 792 F.2d 179, 190 (D.C. Cir. 1986). Standing relies on a showing of personal injury that is fairly traceable to a defendant's allegedly-unlawful conduct and that is likely to be redressed by the requested remedy. *Nat'l Park Hospitality Assoc. v. Dep't of Interior*, 538 U.S. 803, 815 (2003); *Am. Library Ass'n v. FCC*, 401 F.3d 489, 492-93 (D.C. Cir. 2005).[9]

       Defendants argue that any injury suffered by the Plaintiffs could not be "fairly traceable" to the Council's alleged violation of the "second-reading" requirement because Plaintiffs' claim is "unduly speculative" and because "the record evidence does not suggest that yet another

---

     [8] Defendants also urge the Court to decide and dismiss the constitutional claims and, thereafter, "dismiss the local-law claims as well." *Id*. at 5 (citing to *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)). However, "[w]here a party raises both statutory and constitutional arguments . . . ordinarily [federal courts] first address the statutory argument to avoid unnecessary resolution of the constitutional issue." *Blum v. Bacon*, 457 U.S. 132, 137 (1982). *See also Palestine Information Office v. Schultz*, 853 F.2d 932, 939 (D.C. Cir. 1988) (similar).

     [9] Whether the moratorium materially changed the Omnibus Act such that it was not in "substantially the same form" is a question that goes to the merits of Plaintiffs' local law claim and is addressed *infra*. For purposes of resolving this standing challenge to jurisdiction, this predicate is presumed.

reading of the bill would have led a sufficient number of Councilmembers to vote against the

[Omnibus Act]." Defs.' Opp. at 8.[10]  In support of its position, Defendant cites *Dimond*, where the

court dismissed the plaintiff's claim of a procedural violation under the Home Rule Act after finding

no causal connection between the injury and the Council's failure to adhere to proper legislative

process.  792 F.2d 179.[11]

      This case is distinguishable.  Unlike *Dimond*, Plaintiffs have alleged that if the

Omnibus Act – including the Fenty Amendment – had been read twice prior to enactment, a

sufficient number of Councilmembers would have voted against the legislation.  *See* Plaintiffs' Reply

Brief in Support of their Motion for Partial Summary Judgment ("Plfs.' Reply") at 10-12.  *See also*

TRO Memo. at 11-13.  Specifically, they argue that Councilmember Fenty's new amendment would

have failed on a second reading because the other Councilmembers would have had a better

opportunity to understand the legislation for what it was:  an "artfully differentiated" restatement of

the previously-rejected Ward-wide ban.  Pls.' Reply at 11.

      Plaintiffs' argument finds support in the legislative record.  The Omnibus Act had its

---

[10]  Although the extent of harm is disputed, there is no dispute that some Plaintiffs will suffer individualized injury should the moratorium in the Targeted Zone be enforced.  Through affidavits of store owners and expert witnesses, Plaintiffs have shown that they will almost certainly suffer lost profits.  Additionally, they have made a colorable showing that their businesses could be jeopardized.  The requested remedy, an injunction to prevent enforcement of the moratorium, will redress the injury by preventing these losses.

[11]  The plaintiff in *Dimond* challenged the enactment of the 1982 No-Fault Insurance Act, asserting that it was null and void because the D.C. Council failed to read the proposed bill twice in substantially the same form.  792 F.2d at 190.  The District Court dismissed this claim for lack of standing.  The Court of Appeals affirmed, finding that the potential connection between the plaintiff's injury and the Council's failure to read the bill twice was "unduly speculative."  *Id.* at 191.  Specifically, the Court noted the plaintiff's failure to allege that a second reading would have led a sufficient number of Councilmembers to vote against the Act or would have resulted in a substantive change to the content of the statute.  *Id.*

"first reading" on April 20, 2004.  That same day, Councilmember Fenty introduced, for the first time and without public notice, an amendment that would have placed a Ward-wide ban on the sale of single containers of certain types of alcohol in Ward 4.  That amendment failed with vocal opposition by Councilmembers Schwarz, Catania, and Ambrose.  On May 18, 2004, Councilmember Fenty introduced a second amendment, again without public notice, at the "Final Reading" for the Omnibus Act.  The Fenty Amendment was marketed as a more "targeted" and tailored ban in Ward 4, despite the fact that the Targeted Zone was a veiled gerrymandering of Ward 4 designed to include every Class A and Class B license-holder and produce, in effect if not in name, a Ward-wide ban. There is evidence in the legislative record that the Councilmembers may not have understood the difference between the Fenty Amendment and the failed April 20, 2004 amendment.  *See* Streaming Video of May 18, 2004 Council Session, *available at* http://www.dccouncil.washington.dc.us (Fenty asserting that it is a "much more targeted" amendment specifying certain areas in the ward where there is a problem; Schwartz noting that the previous permanent ban was too discriminatory but that the Fenty Amendment was temporary and more narrow because it targeted specific areas that border residential zones; Catania noting that the old "blanket prohibition" was improper but that the new version was a "more tailored measure" to "equate the moratorium to areas where it is needed most," and is therefore "constitutionally defensible;" and Ambrose stating that the Fenty Amendment is more discriminatory because it singles out neighborhoods).  If the public had been given the opportunity to participate in this legislative debate and if the Councilmembers had been afforded the requisite thirteen days to consider the changes, the result may have been different.  Such a conclusion is sufficient for the Court to find that any injury may be fairly traceable to the alleged violation of

the Home Rule Act.[12]

    2.    *Supplemental Jurisdiction*

The District of Columbia argues that the Court should decline to decide this case because it raises issues that are peculiarly local in nature and which should be decided by local, not federal, courts.  This Court, of course, has limited jurisdiction.

Federal-question jurisdiction extends from Article III of the Constitution to those areas that Congress has deemed judicially cognizable in the federal courts.  *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).  *See Hagans v. Lavine*, 415 U.S. 528, 538 (1974) ("Jurisdiction is essentially the authority conferred by Congress to decide a given type of case one way or the other.");  *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986) (jurisdiction under Article III of the Constitution may not be waived and may be addressed by a court on its own initiative).  Among other grants, "[t]he district courts . . . have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  Even if properly pled, however, "federal courts are without power to entertain claims otherwise within their jurisdiction" if they are attenuated, frivolous, or wholly and obviously insubstantial.  *Hagans*, 415 U.S. at 538 (citing *Bailey v. Patterson*, 369 U.S. 31, 33 (1962); *Levering & Garrigues Co. v. Morrin*, 289 U.S. 103, 105 (1933); *Hannis Distilling Co. v. Baltimore*, 216 U.S. 285, 288 (1910); *McGilvra v. Ross*, 215 U.S. 70, 80 (1909);

---

    [12]  It is appropriate to emphasize that the discussion among the members of the Council on May 18, 2004 is cited only as evidence of misunderstanding about the scope of the Targeted Moratorium as it relates to the possibility that a second reading after thirteen days with the opportunity for public input might have led to a different result.  Other than as required by the Home Rule Act, the Constitution, and binding law, the Council is entitled to adopt such legislation as a majority supports for whatever reasons are persuasive to the Councilmembers.

*Newburyport Water Co. v. Newburyport*, 193 U.S. 561, 579 (1904)).

In addition to federal-question jurisdiction, a district court has "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).[13]  A plaintiff must present a sufficiently-substantial federal claim and "the plaintiff's federal and local law claims must 'derive from a common nucleus of operative fact' [that] would ordinarily be tried in a single proceeding."  *Dimond*, 792 F.2d at 188.  Such jurisdiction is discretionary, *Women Prisoners of D.C. Dep't of Corrs. v. District of Columbia*, 93, F.3d 910, 920 (D.C. Cir. 1996), and a district court may decline to exercise supplemental jurisdiction if, *inter alia*, the local law claim "substantially predominates over the claim or claims over which the district court has original jurisdiction," 28 U.S.C. § 1367(c)(2).[14]

Defendants do not argue that Plaintiffs' federal claims are constitutionally insubstantial or otherwise frivolous.[15]  Instead, Defendants offer the more targeted argument that,

---

[13]  The term "State" includes the District of Columbia.  28 U.S.C. § 1367(e).

[14]  Once pendent jurisdiction is properly exercised, "jurisdiction over the primary claim at all stages [is not] a prerequisite to resolution of the pendent claim."  *Rosado v. Wyman*, 397 U.S. 397, 405 (1970).

[15]  In challenging the merits of Plaintiffs' claims, Defendants repeatedly propose that "'[t]he Twenty-first Amendment grants the States virtually complete control over whether to permit importation or sale of liquor and how to structure the liquor distribution system.'" Defs.' Mot. at 13 (quoting *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 110 (1980)).  Accordingly, legislation in this arena is "'supported by a strong presumption of validity and should not be set aside lightly.'" *Id*. at 14 (quoting *North Dakota v. United States*, 495 U.S. 423, 433 (1990)).  Respect for the District's sovereignty demands that the Court accord deference to its determinations regarding its regulatory choices.  The power to regulate, however, is not without boundary.  "[S]tate laws that violate other provisions of the Constitution are not

"[g]iven the demonstrated weakness of the constitutional claims, the Court should not exercise

supplemental jurisdiction over the local-law claims, which are at the heart of plaintiffs' suit."

Defs.' Opp. at 4.  The Court has carefully considered this argument out of respect for the District

and the Council.  Ultimately, however, it is unpersuasive because it conflates distinctly separate

and independent claims.  Plaintiffs' federal claims do not, as argued by Defendants, "derive

wholly from their local law claim . . . ."  *Id*.  Rather, Plaintiffs contend that the District's

threatened action – through the Omnibus Act – would deprive them of property, *i.e.*, the value of

their liquor licenses, without constitutional due process and without just compensation, and

would deny them equal protection of the laws.  That the legislation may have been passed

without observing the dictates of the Home Rule Act is a distinctly separate claim.  This does not

mean that the claims arise from a different nucleus of facts.  Indeed, it is undisputed that the

impetus for this litigation is the passage of the Omnibus Act.  Plaintiffs' constitutional claims go

to the effects of the Omnibus Act, not the alleged procedural irregularities that led to its adoption.

Their local law claim is based entirely on the procedures by which the Council passed the Act.

These are clearly different kinds of claims.

---

saved by the Twenty-first Amendment.  The Court has applied this rule in the context of . . . the
Equal Protection Clause [and] the Due Process Clause . . . ."  *Granholm v. Heald*, 125 S. Ct.
1885, 1903 (1995).

Against this backdrop, Defendants challenge virtually every constitutive element of
Plaintiffs' constitutional claims arguing that: liquor licenses are not property, Defs.' Mot. at 16;
"'substantive due process constrains only egregious government misconduct,'" *id.* at 19 (citation
omitted); Plaintiffs were afforded all the process due, *id*. at 20-21; the law is not
unconstitutionally vague because it gives notice of wrongful conduct, *id*. at 22-23; imposing
conditions on a liquor license is not a constitutional "taking," *id*. at 23-24; and there is no
distinction between "targeted" laws and those of "general applicability," Defs.' Opp. at 20.
Though not decided here, Plaintiffs' constitutional claims are not susceptible to such simple
treatment and casual dismissal, and are sufficient to warrant invocation of federal jurisdiction.

The federal courts have an obligation to exercise the jurisdiction given to them; refraining from such jurisdiction is the exception, not the rule. *Colorado River Water Conserv. Dist. v. United States*, 424 U.S. 800, 817 (1976); *Bridges v. Kelly*, 84 F.3d 470 (D.C. Cir. 1996). Accordingly, the Court can and must exercise jurisdiction over the federal law claims. Finding that the Home Rule Act claim derives from the same common nucleus of operative facts and finding no merit to Defendants' argument that the federal claims derive solely from the local law claim, the Court concludes that its exercise of supplemental jurisdiction over Plaintiffs' Home Rule Act claim is appropriate.[16]

3.    *Abstention*

Even where jurisdiction is proper, abstention may be appropriate. *See Miller-Davis Co. v. Illinois State Toll Highway Auth.*, 567 F.2d 323, 325-26 (7th Cir. 1977) (a federal court cannot abstain until it is satisfied as to its jurisdiction). Abstention may be appropriate in various circumstances. *See Colorado River Water Conserv.*, 424 U.S. at 817-18 (recognizing three types of abstention and noting that it is appropriate in "exceptional circumstances"); *Ohio Bureau of Employment Serv. v. Hodory*, 431 U.S. 471, 475-78 (1977) (recognizing two primary types of federal abstention). Defendants urge the Court to abstain from deciding this case by reference to *R.R. Comm'n v. Pullman Co.*, 312 U.S. 496 (1941) and its progeny. *See* Defs.' Opp. at 6 (citing to cases invoking *Pullman*).

The *Pullman* inquiry focuses on "the possibility that the state courts may interpret a challenged state statute so as to eliminate or at least to alter materially, the constitutional

---

[16]   It is also appropriate because resolution of the Home Rule Act claim requires only a statutory interpretation and avoids uncertain constitutional issues altogether.

question presented." *Hodory*, 431 U.S. at 475.  "[W]hen a federal constitutional claim is premised on an unsettled question of state law, the federal court should stay its hand in order to provide the state courts an opportunity to settle the underlying state-law question and thus avoid the possibility of unnecessarily deciding a constitutional question."  *Harris County Comm'rs Court v. Moore*, 420 U.S. 77, 83 (1975).  Importantly, the mere fact that a pivotal state statute "has never been interpreted" by the state's highest court is not necessarily a ground for abstention.  *Baggett v. Bullitt*, 377 U.S. 360, 375 (1964) (explaining *Pullman*).

*Pullman* involved an order of the Texas Railroad Commission that was enjoined by a three-judge panel.  The Supreme Court found that the suit raised a "more than substantial" constitutional issue but also found that a decision on the constitutional issue could be avoided by a definitive ruling on a state-law question of whether the Railroad Commission had authority to issue the challenged order.  *Pullman*, 312 U.S. at 644.  For these reasons, it ordered the district court to stay it hands pending a determination in state court.  *Id.* at 645-46.

The Court has considered the teaching of *Pullman* and its successor cases but concludes that abstention is inappropriate here despite the facial similarity between this case and *Pullman*. Defendants' argument for abstention relies wholly on the contention that the issue facing the Court is novel and unsettled.  Specifically, Defendants assert that the "plaintiffs' claim regarding what constitutes a second reading 'in substantially the same form' has *not* been directly resolved by the District of Columbia Court of Appeals" and that prior cases arguably on point dealt only with the issue of "the Council's authority to enact or continue emergency legislation." Defs.' Opp. at 5 (emphasis in original).  These arguments are unpersuasive.  D.C. courts have often addressed the Home Rule Act generally and it would be inappropriate to require that each

portion of a statute be construed by local courts before a federal court of competent jurisdiction

could entertain a claim.  *See, e.g.*, *Shayne Bros. v. District of Columbia*, 592 F. Supp. 1128,

1130-31 (D.D.C. 1984) (declining to await a decision by a District of Columbia court on an issue

simply because it had not been construed).  *See also Thomas v. Barry*, 729 F.2d 1469, 1472 (D.C.

Cir. 1984) (noting that abstention from the exercise of federal jurisdiction is extraordinary and

declining to do so in a case involving the Home Rule Act). Furthermore, D.C. courts have, in

fact, examined with some particularity the second-reading requirement of the Home Rule Act in

*WHOC*, 415 A.2d 1349 and *Drudi v. D.C. Bd. of Elections and Ethics*, No. 4716-00, slip op.

(D.C. Super. Ct. July 17, 2000). *See Metzger*, 680 F.2d at 776 (a federal court should be reluctant

to retain pendent jurisdiction when state jurisprudence gives inadequate guidance). Thus, the

local courts have sufficiently spoken to the interpretation of the Home Rule Act, its language is

clear and easy to understand, and the congressional purpose is express – and defined, should such

be needed, by the D.C. Court of Appeals in *WHOC*.  *See* 415 A.2d at 1352 (noting that the

second-reading requirement is "to give notice of a pending proposal so that 'the public and

interested parties can discuss [the] legislation before passage"). Under such circumstances, the

Court does not believe that the issues are "novel and complex" or that the local courts have never

spoken to them.  The Superior Court has provided guidance on "substantially" and the D.C.

Court of Appeals has identified the purpose of the second reading.  These precedents answer the

question posed by Plaintiffs' complaint.[17]  The Court concludes that it can resolve the issues by

---

[17]  In addition, it would be cumbersome and a waste of judicial resources (at best) to have
this case spread between the D.C. Circuit Court of Appeals, which has the TRO and PI on
appeal; the District Court awaiting a local court decision; and the Superior Court and D.C. Court
of Appeals.

the simple expedient of reading the plain meaning of the Home Rule Act and congressional

intentions, together with precedent from the local courts of D.C., without resolution of the

constitutional issues.

      B.      <u>Violation of the Home Rule Act</u>

      Plaintiffs argue that the Omnibus Act is null and void because: 1) the Fenty

Amendment, as added to the Act on May 18, 2004, was a material change requiring that the

Omnibus Act be read again prior to adoption; and 2) that the reconsideration of the Omnibus Act

on June 1, 2004 did not cure this procedural infirmity. Pls.' Mot. at 5-10. Defendants argue in

response that the Fenty Amendment did not "substantially alter" the Omnibus Act and, in any

event, received the required two readings. Defs.' Opp. at 9.[18]

      1.      *Fenty Amendment Was a Substantial Change to the Omnibus Act*

      The Home Rule Act requires two readings of each proposed act "in substantially

the same form" with time in between. D.C. CODE § 1-204.12(a). Defendants contend that,

despite this express language, "[t]here is nothing in the text or legislative history of the Home

Rule Act to indicate that it precludes substantive amendments, even major ones, without sending

the act to a third reading . . . ." Defs.' Opp. at 9. *But see id*. at 11 (only substantial changes

---

[18] Legislative action is presumptively legitimate and a respect for comity and separation of powers demand that the court be circumspect in its review of legislative action. *See Lewis v. Hotel and Rest. Employees Union*, 727 A.2d 297, 300 (D.C. 1999) (citing *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg & Constr. Trades Council*, 485 U.S. 568, 575 (1988)). "Every possible presumption is in favor of the validity of a statute, and this continues until the contrary is shown beyond a reasonable doubt." *Hornstein v. Barry*, 560 A.2d 530, 533 n.5 (D.C. 1989) (citation omitted).

implicate the second-reading requirement).  The Court rejects Defendants' first statement[19] and

accepts the second: substantial changes to legislation require a second reading under the Home

Rule Act. This requirement is mandatory: each proposed act *shall* be read twice. Because the

Fenty Amendment was part of "a comprehensive restructuring of the District's alcoholic-

beverage sales regime," *id.* at 12, and because it comprised merely three pages of a twenty-seven

page act, Defendants argue that it cannot be considered a substantial change requiring a second

reading.  The Court disagrees.

The Superior Court of D.C. has provided guidance on the meaning of the term

"substantially" in this provision.   In *Drudi v. D.C. Bd. of Elections and Ethics*, Civ. No. 00-4716

(D.C. Super. Ct. July 17, 2000), that court analyzed the Council's passage of a school governance

amendment and considered whether the act had been read twice in substantially the same form

prior to its adoption.  At issue was the composition of the school board, particularly the number

of schoolboard members and how they would be elected or appointed.  At its first reading, the

bill provided for seven elected schoolboard members; at its second reading, the bill was amended

to provide voters (who later approved the bill by referendum) two alternatives between an elected

board of nine members or a Mayor-appointed board of five; after the third reading, the legislation

"provided for a hybrid Board composed of four members appointed by the Mayor and confirmed

by the Council along with five members elected by the voters." *Id.* slip op. at 4.  Indeed, there

was full community attention to the issue as the Mayor and City Council jousted concerning their

respective authority over the schoolboard.  Because the amendments introduced during the

---

[19]   The attempt to distinguish the meaning of "substantive amendments" and
"substantially the same form" fails.

statute's readings did not alter the "fundamental character and intent of the proposed legislation" and "never so reconstituted the Bill or recast its purpose as to amend or alter its basic character," the Superior Court concluded that it was properly adopted.  *Id*. slip op. at 9.  The Superior Court also found that the amendments "cannot be said to have altered its essence or to have concealed its purposes and to have mislead plaintiff."  *Id*. at 10.

In contrast, the Fenty Amendment was a substantial change to the Omnibus Act, altering its substance in material ways and disguising a purpose to the legislation.  The Fenty Amendment did not merely change a pre-existing provision (such as the number of schoolboard members or their appointment process) but introduced an entirely new and onerous regime.  Here the proof is in the pudding.  When the Council voted on a clear Ward-wide ban, it was rejected. When the Council voted on the Fenty Amendment as a "targeted" ban, it passed.  The comments of Councilmembers make it clear that it was the "targeted" nature of the Fenty Amendment that allowed passage.  *See* Streaming Video of May 18, 2004 Council Session, *available at* http://www.dccouncil.washington.dc.us (comments of Councilmembers Fenty, Schwartz, Catania, and Ambrose, described *supra*).  In truth, however, the Fenty Amendment was just as broad as its rejected predecessor.  Licensees would not be able lawfully to sell single containers of certain alcoholic beverages in the "targeted" area nor transfer licenses to new locations in Ward 4 outside the "targeted" area.  With the Council's clear objection to a Ward-wide ban, the Court must conclude that a majority of the Council considered such a ban of substantial meaning.

In addition, the effect of the Fenty Amendment would be substantial.  It would impose significant new restrictions on Class A and Class B liquor licensees in Ward 4.  The added restrictions were neither procedural nor minor additions to comprehensive regulatory

legislation.  Rather, incorporation of the moratorium into the Omnibus Act threatened the profits

and, possibly, the livelihood of the seventy-three covered businesses in Ward 4 and barred them

from relocating in Ward 4 outside the targeted area.

　　　　　2.　　　*Omnibus Act Not Read in Substantially the Same Form Prior to Adoption*

　　　　　Defendants also propose that the Omnibus Act was "read" at least twice prior to

adoption by the Council.  They point to the consideration of the Omnibus Act "at three legislative

sessions: April 20, 2004; May 18, 2004; and June 1, 2004."  Defs.' Opp. at 12.  At oral argument,

the Court unsuccessfully sought clarification from Defendants regarding what constitutes a

"reading" for purposes of the Home Rule Act.

> THE COURT:  . . .  Now you tell me how you would define a reading for
> purposes of the Home Rule Act.  What constitutes a reading?
>
> MR. SAINDON:  What happened here, Your Honor, it's brought up if it's read
> again in a legislative session in substantially the same form, that's a reading.
> . . . .
>
> THE COURT:  I'm trying to figure out what the District's position is.
>
> MR. SAINDON:  I hesitate to speculate as to what a reading would be in every
> circumstance.  It happened here Your Honor.

June 3, 2005 Hearing Tr. at 37-38.

　　　　　Congress created the second-reading requirement to give notice of a pending

proposal so that "the public and interested parties can discuss this legislation" before passage.

*Staff of the House Comm. on the District of Columbia*, 93d Cong., 2d Sess., Home Rule for The

District of Columbia 1973-1974 at 1042 (Comm. Print 1974) (statement of Rep. Thomas M.

Rees).  This requirement is "often found in municipal charters" and "serves the purpose of

permitting the public to participate in the legislative process." *WHOC*, 415 A.2d at 1352 n.8

(citing *Town of Burnsville v. City of Bloomington*, 128 N.W. 2d 97, 102 (Minn. 1964); *Hatfield*

*v. Meers*, 402 S.W. 2d 35, 44-45 (Mo. App. 1966)).   "Congress, fundamentally, required a

second reading and congressional layover as necessary safeguards whenever long-term

legislation is adopted." *Id.* at 1357-58.

   A "reading" may be understood simply as "[t]he recitation aloud of a bill or other

main motion, sometimes by title only, usually in a series of three such recitations necessary

before a legislative body can pass a bill." BLACK'S LAW DICTIONARY 1291 (Eighth Ed. 1999).

Although the Omnibus Act arguably was, in some sense, "read" because it was raised and

discussed on at least three occasions, the public was given no notice of substantive changes to a

proposed law that would directly affect it and no opportunity to participate in its consideration.

Against the backdrop of the legislative history of the Home Rule Act, a process that failed to

notify the public of substantive changes in legislation cannot be considered a "reading."

> The first step in statutory construction is to examine the language of the statute and to interpret its words according to their plain and ordinary meaning.  Our primary goal is to ascertain and give effect to the intent of the legislative body that drafted the language.  The statutory meaning of a term must be derived from a consideration of the entire enactment against the backdrop of its policies and objectives.  Even where the words of a statute have superficial clarity, it is appropriate to undertake a review of the legislative history to aid in the ascertainment of legislative intent.

*Tenley and Cleveland Park Emergency Comm.*, 550 A.2d at 334 n.10 (internal citations omitted).

Congress was quite explicit as to its intent: the second reading after a passage of days is to allow

"the public and interested parties [to] discuss" legislation contemplated by the Council. *Staff of*

*the House Comm. on the District of Columbia*, 93d Cong., 2d Sess. Home Rule for The District

of Columbia 1973-74 at 1042 (Comm. Print 1974). *See also* D.C. CODE § 1-204-04(c) (Congress

directed the Council to "adopt and publish rules of procedures which shall include provisions for

adequate public notification of intended actions of the Council."). There was no opportunity for

public input here. Even the discussion on June 1 could not "cure" the prior deficiency (whereby

the Council had passed a final version of the bill without a second reading of the Fenty

Amendment), because there was no prior notice to the public that the bill would be reconsidered.

Congress and the Home Rule Act are clear: the Council must afford the *opportunity* for public

discussion between the first and second/final "readings." Without that mandatory notice, any

"reading" is infirm. To find otherwise would ignore the requirements of the Home Rule Act and

the clearly expressed intentions of the Congress.[20]

> 3.    *Remedy: Fenty Amendment Null and Void*

Because "[t]he Council shall have no authority to pass any act contrary to the

provisions of this chapter except as specifically provided in this chapter," a second reading is

mandatory. D.C. CODE § 1-206.02. Where notice or publication is mandatory in the specified

interval between introduction and passage, "material amendments" cannot be made at the hearing

at which the act is passed. 5 MCQUILLIN MUN. CORP. § 16.87 & 16.88.

When the Council exceeds its authority, the appropriate remedy is nullification of

the act in whole or in part. *See*, *e.g.*, *Bishop v. District of Columbia*, 411 A.2d 997 (D.C. 1980)

(en banc) (invalidating revenue act); *Capital Hill Restoration Soc'y, Inc. v. Moore*, 410 A.2d 184

(D.C. 1979) (nullifying the Council's effort to confer jurisdiction). The traditional canon of

---

[20]  Because it has not analyzed the substantiality of the Supermarket Amendment, the
Court expresses no opinion on whether the Supermarket Amendment would constitute a
substantial change in the Omnibus Act requiring a second reading.

severability is that "unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987). *See Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 506 (1985) ("Partial invalidation would be improper if it were contrary to legislative intent in the sense that the legislature had passed an inseverable Act or would not have passed it had it known the challenged provision was invalid."); *Champlin Refin. Co. v. Corp. Comm'n*, 286 U.S. 210, 234 (1932) (similar); *McClough v. United States*, 520 A.2d 285, 289 (D.C. 1987) (noting that the inquiry into the legislature's intent can be "elusive" but "there is a presumption of severability whenever the remaining provisions, standing alone, are 'fully operative as a law.'" (citation omitted)). These principles are captured in D.C. Code § 45-201(a) which provides that, unless specifically excepted in a particular act,

> if any provision of any act of the Council of the District of Columbia or the application thereof to any person or circumstance is held to be unconstitutional or beyond the statutory authority of the Council of the District of Columbia, or otherwise invalid, the declaration of invalidity shall not affect other provisions or applications of the act which can be given effect without the invalid provision or application, and to this end the provisions of each act of the Council of the District of Columbia are deemed severable.

D.C. CODE § 45-201(a).[21]

---

[21]   D.C. Code § 45-201(b) states:

> The Council of the District of Columbia may provide, within the provisions of a specific act, that the provisions of a specific act are non severable or that certain specified provisions are deemed inoperative if certain other provisions of the act are declared invalid. If the Council of the District of Columbia provides for a

In this instance, neither the language of the Act nor its legislative history suggest that the Omnibus Act would not have passed absent the Fenty Amendment.  In fact, the willingness of the Council to proceed with the Omnibus Act on April 20, 2004 after rejecting a proposed moratorium in Ward 4 is direct evidence to the contrary.  Because there is no specific severability provision within the Omnibus Act and because the remaining portions of the Act can be given full effect, only those portions that pertain to the Targeted Moratorium in Ward 4 and which were not included through valid legislative process are null and void.  *See Gary v. United States*, 499 A.2d 815, 821-22 (D.C. 1985) (severance appropriate where act contained no severability clause and where the act remained fully operative as law without the offending provision).

C.     Remaining Arguments Moot

Because the Court finds the moratorium in Ward 4 null and void and because the preliminary injunction forestalled injury to Plaintiffs, the constitutional claims are rendered moot and need not be addressed.  *See United States v. Wade*, 152 F.3d 969, 970-71 (D.C. Cir. 1988) (citing *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J. concurring) ("The Court will not pass upon a constitutional question . . . if there is also present some other ground upon which the case may be disposed of."));  *Powell v. McCormack*, 395 U.S. 486, 496 (1969) (doctrine of mootness requires courts to dismiss cases where the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome);  *Comm. in Solidarity*

---

special nonseverability clause as provided in this subsection, the long title of the act shall reflect the inclusion of a special nonseverability clause.

*with the People of El Salvador v. Sessions*, 929 F.2d 742, 744 (D.C. Cir. 1991) ("In injunction suits, plaintiffs usually must establish that the allegedly illegal actions of the past are causing or threatening to cause them present injuries . . . .  If the possibility of continuing injury disappears . . . the complaint ordinarily should be dismissed as moot.").

## CONCLUSION

For the reasons stated, Plaintiffs' Partial Motion for Summary Judgment is granted in part and denied in part.  Summary Judgment is **GRANTED** as to Plaintiffs' claim under the Home Rule Act and the Fenty Amendment, Title I, Section 101(o) of the Omnibus Act, is declared null and void.  Plaintiffs' remaining claims are **DENIED AS MOOT**.  Defendants' Second Motion to Dismiss or, in the Alternative, for Summary Judgment is **DENIED**.  A separate Order accompanies this memorandum opinion.


DATE: June 16, 2005.                                  /s/
                                                      ROSEMARY M. COLLYER
                                                      United States District Judge